## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**O.E. BY AND THROUGH HIS PARENTS**                **CIVIL ACTION**

**VERSUS**                                         **NO. 23-2578**

**NEW ORLEANS REGION TRANSIT**                     **SECTION: "G"(4)**
**AUTHORITY**

## ORDER AND REASONS

In this litigation**,** Plaintiff O.E. by and through his parents ("Plaintiff"), brings claims against the New Orleans Regional Transit Authority ("RTA") pursuant to the Americans with Disabilities Act and the Louisiana Human Rights Act. Plaintiff, a seven-year-old boy with multiple disabilities who uses a wheelchair, alleges that he was denied access to a streetcar along the St. Charles Ave. route.[1]

Before the Court is Plaintiff's Motion for Preliminary Injunction seeking two forms of preliminary injunctive relief: (1) an Order stating that RTA must comply with 49 C.F.R. § 37.167(g) by allowing Plaintiff to board and disembark at any streetcar stop where the wheelchair lift can be safely deployed, regardless of whether RTA believes a particular stop is fully compliant with the technical scoping requirements of the ADA; and (2) an order stating that RTA must comply with 49 C.F.R. § 37.167(f) by adding location data to its "app" (called "Le Pass"), so that Plaintiff (and other wheelchair users) can see the location of the two wheelchair-accessible streetcars on the St. Charles line in real time, rather than guessing and waiting for one to finally

---

[1] Rec. Doc. 1.

1

arrive.[2] In opposition, RTA contends that it would be unsafe and irresponsible, given current operating practices and existing site conditions along the line, to treat any of the requested additional stops in the same manner as RTA's current ADA stops.[3] The Court held an evidentiary hearing on December 12, 2023.[4] On January 30, 2024, the Court conducted a site visit to the St. Charles streetcar line with the parties. Considering the motion, the memoranda in support and in opposition, the record evidence, information gathered during the site visit and the applicable law, the Court grants the motion.

## I. Background

Plaintiff is a seven-year-old boy with an extremely rare genetic disorder called 21q Partial Deletion Syndrome.[5] Plaintiff is unable to walk and uses a wheelchair for mobility.[6] Defendant New Orleans Regional Transit Authority is a political entity organized under state law, created "to plan, design, lease as lessee, purchase, acquire, hold, own, construct, improve, have an equity in, finance, maintain, and administer a transit system within the metropolitan area" of New Orleans.[7]

In March of 2023, Plaintiff and his parents tried to board the streetcar at the corner of Spruce St. and S. Carrollton Ave.[8] Plaintiff alleges that the streetcar driver told Plaintiff's father "you need an ADA car," and explained that only some of the cars on the St. Charles Ave. streetcar line are "ADA cars" that have a wheelchair lift and that they are marked with the "handicapped

---

[2] Rec. Doc. 9.

[3] Rec. Doc. 19.

[4] Citations to the hearing transcript ("Tr.") refer to the volume for the December 12, 2023 proceedings unless otherwise noted.

[5] Rec. Doc. 1 at 4.

[6] *Id.*

[7] La. Rev. Stat. § 48:1654.

[8] Rec. Doc. 1 at 5.

symbol."[9] Plaintiff contends that he and his family waited for over an hour and no "ADA cars" passed.[10] Plaintiff submits that his parents downloaded RTA's mobile app called "Le Pass."[11] Le Pass did not specify which cars are "ADA cars."[12]

On April 30, 2023, Plaintiff and his family attempted to board a streetcar displaying the International Symbol of Access (♿) at the corner of Sycamore St. and S. Carrollton Ave.[13] Plaintiff alleges that the driver told Plaintiff's family that they could not board because the Sycamore St. stop was not an "ADA stop," explaining that wheelchair users can only board at certain designated stops.[14] The RTA supervisor came out to the stop and told Plaintiff's father that they would be allowed to board at the Sycamore St. streetcar, but they could only disembark at the intersection of St. Charles Ave. and Napoleon Ave.[15] Plaintiff submits that this was a major inconvenience, and again, Plaintiff was unable to ride the streetcar.[16] There are 114 total stops along the St. Charles Ave. streetcar line, twelve of which are "ADA compliant."[17]

On July 19, 2023, Plaintiff filed a Complaint in this Court against RTA.[18] On September

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 1. The Complaint states that out of 114 total stops, twelve are ADA compliant. RTA's opposition to the Motion for Preliminary Injunction states out of 107 total stops, ten are ADA compliant.

[18] Rec. Doc. 1.

6, 2023, Plaintiff filed the instant Motion for Preliminary Injunction.[19] On October 16, 2023, with leave of Court, RTA filed an opposition to the motion.[20] On October 24, 2023, Plaintiff filed a reply memorandum in further support of the motion.[21] The Court held an evidentiary hearing on December 12, 2023. On January 30, 2024, the Court and the parties conducted a site visit along the St. Charles Avenue Streetcar line. On February 23, 2024, the parties filed a Joint Supplemental Memorandum, wherein Plaintiff submitted a revised list of challenged stops, and the parties stipulated to allowing Plaintiff to embark and disembark an ADA-accessible streetcar at the Tulane University/Loyola University & St. Charles Avenue stops.[22]

## II. Parties' Arguments

### A.   *Plaintiff's Arguments in Support of the Motion*

First, Plaintiff asks this Court to order RTA to allow Plaintiff to board and exit streetcars along the St. Charles Ave. streetcar line at every stop between Claiborne Ave. and Howard Ave. at which there is room to safely deploy a wheelchair lift.[23] Plaintiff submits that, as it stands, Plaintiff is only allowed to use twelve stops which RTA has deemed "ADA-accessible stops."[24] Plaintiff submits that he does not require a completely level surface, bollards, or a stop that meets every Department of Transportation ("DOT") scoping requirement.[25] Plaintiff contends that if the wheelchair lift can land with at least two to three feet of clearance space between the lift and the

---

[19] Rec. Doc. 9.

[20] Rec. Doc. 16.

[21] Rec. Doc. 21.

[22] Rec. Doc. 29.

[23]  Rec. Doc. 9-1 at 6.

[24] *Id.*

[25] *Id.* at 7.

street, he can be safely pushed on and off the lift.[26] Plaintiff specifies that this motion seeks access only to the "right-side" lifts on the streetcars.[27]

On February 23, 2024, Plaintiff filed an amended list of challenged stops along the St. Charles streetcar line including the following:

1. St. Charles Ave. and Lafayette St. (outbound);
2. Tivoli Circle (inbound);
3. Tivoli Circle (outbound);
4. St. Charles Ave. and Erato St. (inbound);
5. St. Charles Ave. and Erato St. (outbound);
6. St. Charles Ave. and MLK Blvd./Melpomene St. (inbound);
7. St. Charles Ave. and MLK Blvd./Melpomene St. (outbound);
8. St. Charles Ave. and Euterpe St. (inbound);
9. St. Charles Ave. and Euterpe St. (outbound);
10. St. Charles Ave. and Felicity St. (inbound);
11. St. Charles Ave. and Felicity St. (outbound);
12. St. Charles Ave. and St. Andrew St. (inbound);
13. St. Charles Ave. and St. Andrew St. (outbound);
14. St. Charles Ave. and Constantinople St. (inbound);
15. St. Charles Ave. and Constantinople St. (outbound);
16. St. Charles Ave. and Milan St. (inbound);
17. St. Charles Ave. and Milan St. (outbound);
18. St. Charles Ave. and Jena St. (inbound);
19. St. Charles Ave. and Jena St. (outbound);
20. St. Charles Ave. and Cadiz St. (inbound);
21. St. Charles Ave. and Cadiz St. (outbound);
22. St. Charles Ave. and Bordeaux St. (inbound);
23. St. Charles Ave. and Bordeaux St. (outbound);
24. St. Charles Ave. and Robert St. (inbound);
25. St. Charles Ave. and Robert St. (outbound);
26. St. Charles Ave. and Duffosat St. (inbound);
27. St. Charles Ave. and Valmont St. (inbound);
28. St. Charles Ave. and Valmont St. (outbound);
29. St. Charles Ave. and Jefferson Ave. (inbound);
30. St. Charles Ave. and Jefferson Ave. (outbound);
31. St. Charles Ave. and Joseph St. (inbound);
32. St. Charles Ave. and Joseph St. (outbound);
33. St. Charles Ave. and Nashville Ave. (inbound);
34. St. Charles Ave. and Nashville Ave. (outbound);
35. St. Charles Ave. and State St. (inbound);

---

[26] *Id.*

[27] *Id.*

5

36. St. Charles Ave. and State St. (outbound);
37. St. Charles Ave. and Webster St. (inbound);
38. St. Charles Ave. and Webster St. (outbound);
39. St. Charles Ave. and Calhoun St. (inbound);
40. St. Charles Ave. and Calhoun St. (outbound);
41. St. Charles Ave. and Exposition Blvd. (inbound);
42. St. Charles Ave. and Exposition Blvd. (outbound);
43. St. Charles Ave. and Tulane/Loyola (inbound);
44. St. Charles Ave. and Tulane/Loyola (outbound);
45. St. Charles Ave. and Tulane University (inbound);
46. St. Charles Ave. and Tulane University (outbound);
47. St. Charles Ave. and Walnut St. (inbound);
48. St. Charles Ave. and Walnut St. (outbound);
49. St. Charles Ave. and Broadway St. (inbound);
50. St. Charles Ave. and Broadway St. (outbound);
51. Carrollton Ave. and Maple St. (inbound);
52. Carrollton Ave. and Maple St. (outbound);
53. Carrollton Ave. and Freret St. (inbound);
54. Carrollton Ave. and Freret St. (outbound);
55. Carrollton Ave. and Oak St. (inbound);
56. Carrollton Ave. and Oak St. (outbound);
57. Carrollton Ave. and Willow St. (inbound);
58. Carrollton Ave. and Willow St. (outbound);
59. Carrollton Ave. and Jeannette St. (inbound);
60. Carrollton Ave. and Birch St. (outbound);
61. Carrollton Ave. and Hickory St. (inbound);
62. Carrollton Ave. and Hickory St. (outbound);
63. Carrollton Ave. and Spruce St. (inbound);
64. Carrollton Ave. and Spruce St. (outbound);
65. Carrollton Ave. and Sycamore St. (inbound);
66. Carrollton Ave. and Sycamore St. (outbound).[28]

Second, Plaintiff seeks an Order directing RTA to take immediate steps to update its mobile application, Le Pass, so that wheelchair users can see the live location of the two wheelchair-accessible cars.[29]

Plaintiff argues that he is substantially likely to prevail on the merits of his discrimination

---

[28] Rec. Doc. 29.

[29] Rec. Doc. 9-1 at 8.

claims under Title II of the ADA.[30] Plaintiff contends that RTA is violating 49 C.F.R. § 37.167(g) by declaring over 90% of its stops "off limits" to Plaintiff even though there is adequate space to deploy the wheelchair lift, and there is no chance that the wheelchair lift will be damaged at these stops.[31] Plaintiff avers that RTA's fear of liability is not a valid basis to refuse Plaintiff access to 90% of the streetcar stops along the St. Charles Ave. line.[32]

Plaintiff contends that he is substantially likely to prevail on his claim requiring RTA to add real-time location data for its "ADA cars" to the Le Pass app.[33] Plaintiff argues that the RTA is violating its obligation to "mak[e] adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service."[34]

Plaintiff avers that his irreparable harm is presumed since Title II of the ADA "expressly authorize[s]" the injunctive relief that Plaintiff seeks.[35] Thus, Plaintiff submits, if the Court concludes that there is a substantial likelihood that RTA is violating the ADA, then irreparable harm is presumed.[36] Plaintiff further argues that there is irreparable harm since Plaintiff will never be able to relive his childhood in which he is being deprived equal access to the streetcar.[37]

Plaintiff asserts that his ongoing irreparable harm far outweighs any burden on RTA.[38] Plaintiff submits that the proposed injunction would merely require RTA to deploy its wheelchair

---

[30] *Id.* at 9.

[31] *Id.* at 10–11.

[32] *Id.* at 14.

[33] *Id.* at 16.

[34] *Id.*

[35] *Id.* at 18.

[36] *Id.*

[37] *Id.*

[38] *Id.*

lifts at certain stops along the St. Charles Streetcar line and to implement a minor update on its mobile app.[39]

Plaintiff contends that granting the injunctive relief sought is in the public interest because the public has an interest in ensuring that public entities follow the law, especially civil rights laws like the ADA.[40]

Lastly, Plaintiff submits that the Court should not require the posting of security.[41] Plaintiff contends that granting the injunctive relief sought will not cause any financial harm to RTA.[42]

**B.       RTA's Argument in Opposition to the Motion**

In opposition, RTA examined each of the 72 total stops on the St. Charles Ave. streetcar line that are not excluded by Plaintiff and are inclusive of inbound and outbound stops along S. Carrollton Ave., St. Charles Ave., and Carondelet St.[43] The objective, RTA explains, is to determine whether any of the challenged stops could safely be included without any additional modifications or improvements to provide the "immediate access" requested.[44]

Referencing the ADA Standards, RTA submits that only one stop along the St. Charles Ave. streetcar line—St. Charles Ave. and Julia St. outbound—has a combination of existing conditions that would safely accommodate the stop.[45] However, RTA contends that its inbound

---

[39] *Id.*

[40] *Id.* at 19.

[41] *Id.*

[42] *Id.* at 20.

[43] Rec. Doc. 19 at 2. Plaintiff's Preliminary Injunction states that there are 87 challenged stops while RTA states 72 of the stops are challenged.

[44] *Id.*

[45] *Id.* at 5.

pair stop is not accessible nor included in Plaintiff's motion.[46] RTA asserts that the current condition of the 72 stops deemed unsafe for picking up and dropping off of passengers requiring the carborne wheelchair lift can be summarized as follows:

- Insufficient Clearance (less than 11'2" to curb) (32 of the challenged stops)
- Inaccessible Route to Pad (34 of the challenged stops)
- Lift Cannot Be Safely Deployed (5 of the challenged stops)
- Can be Used Currently, but without Outbound Pair (1 of the challenged stops)[47]

RTA explains that 32 of the stop locations do not offer adequate clearance, 11 feet 2 inches, to safely deploy the carborne lift.[48] Next, RTA states that 34 of the stop locations do not meet ADA standards for a "stable surface."[49] Lastly, RTA asserts that five stops did not pass the lift test which included unlevel surfaces where the lift cannot fully deploy and locations whereby the wheelchair lift deployed into the parking lane.[50]

RTA contends that all stop locations are capable of being made safe for wheelchair access, but all require some level of civil engineering work.[51] RTA suggests that together the parties can develop plans for upgrading surface treatments and/or reconfiguring curb lines/traffic flow, but it would be unsafe and irresponsible to suddenly treat any of the challenged stops in the same manner as RTA's current ADA stops.[52]

*C.* ***Plaintiff's Argument in Further Support of the Motion***

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 6.

[49] *Id.*

[50] *Id.* at 7.

[51] *Id.*

[52] *Id.*

Plaintiff submits that RTA's opposition does not address 49 C.F.R. § 37.167(g) or 49 C.F.R. § 37.167(f), nor does RTA state why it is not bound by them.[53] Plaintiff contends that RTA does not address Plaintiff's second form of injunctive relief related to the Le Pass Application at all.[54] It is Plaintiff's position that it must be implied that RTA concedes that 49 C.F.R. § 37.167(f) requires RTA to add location data to the application, and Plaintiff has therefore met his burden of showing that preliminary injunctive relief related to 49 C.F.R. § 37.167(f) is warranted.[55]

Plaintiff asserts that RTA does not dispute the accuracy of any facts submitted by Plaintiff's verified complaint or declaration, and the Court may deem those facts admitted for purposes of this motion.[56] Plaintiff argues that RTA's opposition only includes unverified, unsubstantiated documents and naked allegations.[57] For this reason, Plaintiff avers that he has met his burden of showing that preliminary injunctive relief related to 49 C.F.R. § 37.167(g) is warranted.[58]

Plaintiff submits that he does not need "11 feet and 2 inches," as submitted by RTA; to safely board or disembark the lift he needs only 10 feet.[59] Plaintiff argues that RTA does not allege that the mechanism will not work at any of the challenged stops, or that the lift would be damaged pursuant to 49 C.F.R. § 37.167(g).[60]

Plaintiff submits that "[i]t is not consistent with [49 C.F.R. § 37.167(g)] for a transit

---

[53] Rec. Doc. 21 at 2.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 3.

[59] *Id.* at 4.

[60] *Id.*

provider to declare a stop off-limits to someone who uses the lift while allowing other passengers to use the stop."[61] Plaintiff argues that RTA provides no evidence that five stops in the Central Business District "did not pass the lift test."[62] Plaintiff submits that even assuming this is true, this is not a basis to refuse to deploy the lift.[63]

### III. Legal Standard

Four elements must be proven before a court will issue a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the nonmovant; and (4) granting the injunction will not disserve the public interest.[64] If the movant fails to meet its burden regarding any one of the necessary elements, a court need not address the other elements necessary for granting a preliminary injunction.[65] At all times, the burden of persuasion remains on the movant as to each of these four elements.[66] However, these factors "are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others."[67]

---

[61] *Id.*

[62] *Id.* at 5.

[63] *Id.*

[64] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192,195–96 (5th Cir. 2003) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

[65] *See Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (declining to address the remaining elements necessary to obtain a preliminary injunction after finding that plaintiff failed to show a substantial likelihood of success on the merits); *see also Barton v. Huerta*, 613 F. App'x 426, 427 (5th Cir. 2015) ("[F]ailure to succeed on any one of the elements results in a denial of injunctive relief.").

[66] *Callaway*, 489 F.2d at 573 (vacating an injunction where the district court improperly placed the burden of persuasion on the defendants to prove the injunction should not be granted, rather than requiring plaintiffs to carry their burden).

[67] *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

Whether to grant or to deny a preliminary injunction is within the discretion of the trial court,[68] but "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[69]

## IV. Analysis

### A.   *Substantial Likelihood of Success on the Merits*

Plaintiff argues that he has demonstrated a substantial likelihood of success on the merits of his ADA claim. The Americans with Disabilities Act[70] was passed by Congress with the specific mandate of eliminating discrimination against individuals with disabilities.[71] The focus of this case is Title II of the ADA, which covers discrimination in the provision of public services.[72] Title II is divided into two parts: Part A covers public services generally,[73] and Part B applies specifically and only to public transportation provided by public entities.[74] It is undisputed that RTA is covered by Part B of Title II.

Title II of the ADA says that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[75] A "public entity" includes "any department, agency, special purpose district, or other

---

[68] *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

[69] *Miss. Power & Light*, 760 F.2d at 621 (5th Cir. 1985).

[70] 42 U.S.C. §§ 12101, *et seq.,*

[71] *See* 42 U.S.C. § 12101(b)(1).

[72] *See* 42 U.S.C. §§ 12131, *et seq.*

[73] 42 U.S.C. §§ 12131, *et seq.*

[74] 42 U.S.C. §§ 12141, *et seq.*

[75] 42 U.S.C. § 12132.

instrumentality of a State or States local government."[76] Congress directed the Department of Transportation to promulgate regulations implementing Title II regulations to public transportation services.[77]

To prevail on a Title II Americans with Disabilities Act (ADA) claim, a plaintiff must demonstrate: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.[78]

### 1.      Whether Plaintiff has a Qualifying Disability

The first element of a claim under Title II of the ADA is that the plaintiff must have a qualifying disability. An individual has a disability if he or she "[has] a physical or mental impairment that substantially limits one or more major life activities of such individual."[79] Walking, standing, and breathing are all "major life activities."[80] Title II defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[81]

---

[76] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).

[77] 42 U.S.C. § 12102.

[78] Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

[79] 42 U.S.C. § 12102(1)(A).

[80] *Id.* at § 12102(2)(A).

[81] *Id.* at § 12131(2).

There is no dispute that Plaintiff is a qualifying individual under the ADA. The Complaint alleges that Plaintiff has an extremely rare genetic disorder called 21q Partial Deletion Syndrome, is unable to walk, and uses a wheelchair for mobility.[82] During the evidentiary hearing, the parties stipulated that Plaintiff has a qualifying disability.[83] As such, Plaintiff has established that he is a qualified individual with a disability for purposes of Title II.

### 2. Whether Plaintiff Was Either Excluded from Participation in or Denied the Benefits of RTA's Services, Programs, or Activities or Was Otherwise Discriminated Against

The second element of a claim under Title II of the ADA is whether Plaintiff was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against. It is undisputed that RTA is a public entity that provides transit services.

Under Title II, "it shall be considered discrimination . . . for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that, when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities."[84] "Accessible means, with respect to vehicles and facilities, complying with the accessibility requirements of parts 37 and 38 of this title."[85] Plaintiff alleges that RTA has discriminated against him by violating 49 C.F.R. § 37.167(f) and 49 C.F.R. § 37.167(g). As such, the Court will address each alleged violation in turn.

### a. Whether RTA is in compliance with the accessibility requirements of 49 C.F.R. § 37.167(f)

---

[82] Rec. Doc. 1 at 4.

[83] Tr. at 26.

[84] 42 U.S.C. § 12148(a)(1); 49 C.F.R. § 37.61(a).

[85] 49 C.F.R. § 37.3.

49 C.F.R. § 37.167(f) provides, "[t]he entity shall make available to individuals adequate information concerning transportation services. This obligation includes making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service." Plaintiff contends that the LePass app does not include real time location of the ADA accessible streetcars, and thus, Plaintiff and other wheel-chair users are unable to adequately plan and schedule use of the streetcars. RTA does not address this issue in its opposition.

At the evidentiary hearing, RTA stipulated to updating the LePass app.[86] During the site visit on January 30, 2024, RTA informed the Court that the LePass app had recently been updated. A demonstration of the app was provided. An icon was displayed beside each car which tells users whether the car is ADA accessible. The app also now allows users to track a streetcar and see its estimated time of arrival. The Court takes notice of the recent updates to the LePass app and finds that RTA is now in compliance with the accessibility requirements of 49 C.F.R. § 37.167(f).

> **b.     Whether RTA is in compliance with the accessibility requirements of 49 C.F.R. § 37.167(g)**

49 C.F.R. § 37.167(g) provides, "[t]he entity shall not refuse to permit a passenger who uses a lift to disembark from a vehicle at a designated stop, unless the lift cannot be deployed, the lift will be damaged if it is deployed, or temporary conditions at the stop, not under the control of the entity, preclude the safe use of the stop by all passengers."

Plaintiff alleges that he was first refused access while attempting to board a streetcar that was not an "ADA car."[87] Plaintiff contends that he was, again, refused access to an "ADA car"

---

[86] Tr. at 13.

[87] Rec. Doc. 1 at 5.

because the stop was not an "ADA stop."[88] Plaintiff submits that an RTA supervisor arrived on the scene and told Plaintiff's father they could board the streetcar, but they could not disembark at their desired location.[89] RTA's website provides that wheelchair riders can only enter and exit at one of the twelve ADA-accessible stops.[90]

In opposition, RTA states, citing the Architectural and Transportation Barriers Compliance Board[91] and the DOT ADA Standards,[92] that: (1) 32 of the challenged stops had insufficient clearance (less than 11'2" to curb) to safely deploy the lift; (2) 34 of the challenged stop locations do not have a "stable surface" as defined by the ADA Standards; and (3) 5 of the challenged stops did not pass the lift test, including unlevel surfaces where the lift could not fully deploy.[93] RTA states, "it would be unsafe and irresponsible, given current operating practices and existing site conditions along the line, to suddenly treat any of the requested additional stops in the same manner as RTA's current ADA stops."[94] At the evidentiary hearing, Craig Stuart Toomey, RTA's Director of Emergency Management, testified that "[g]enerally, that the lift – there's two conditions. One, that the lift goes down. It has to be a level surface for the actual lip to deploy in front of the lift. It has to be a level, sturdy surface for it to be deployed safely."[95]

---

[88] *Id.*

[89] *Id.* at 6.

[90] *Id.* at 8.

[91] 36 C.F.R Parts 1191, 1192.

[92] 49 C.F.R Parts 37, 38.

[93] Rec. Doc. 19 at 6–7.

[94] *Id.* at 7.

[95] Tr. at 76.

In his reply memorandum, Plaintiff further argues that since his wheelchair is pushed by his parents, he does not need "11 feet and 2 inches" as required to be ADA compliant.[96] Plaintiff contends that 49 C.F.R. § 37.167(g) requires "that the mechanism will not work at the location to permit a wheelchair user . . . to disembark or that the lift will be damaged if it is used there," which is not asserted by RTA.[97] Plaintiff argues that even if the challenged stops did not pass the lift test, this is not a basis to refuse to deploy the lift, nor can RTA declare the stop off-limits to him.[98]

As stated above, "[a]ccessible means, with respect to vehicles and facilities, complying with the accessibility requirements of parts 37 [Transportation Services for Individuals with Disabilities] and 38 [Americans with Disabilities Act Accessibility Specifications] of this title."[99] It is undisputed that Parts 37 and 38 of Title 49 of the Code of Federal Regulations are applicable to the St. Charles streetcar line.

The Code of Federal Regulations provides that "[b]us boarding and alighting areas shall provide a clear length of 96 inches measured perpendicular to the curb or vehicle roadway edge, and a clear width of 60 inches, measured parallel to the vehicle roadway."[100]

---

[96] Rec. Doc. 21 at 4.

[97] *Id.*

[98] *Id.* at 5.

[99] 49 C.F.R. § 37.3.

[100] 49 C.F.R. Part 37, Appendix A. (See figure on next page). *See also* Department of Justice, ADA 2010 Standards: 810.2.2 Transportation Facilities, Dimensions.



The Court cannot identify any supporting authority that requires clearance of 11 feet and 2 inches from the curb as stated by RTA, nor has RTA cited any supporting authority that calls for 11 feet and 2 inches of clearance from the curb. At the evidentiary hearing, Craig Stuart Toomey, RTA's Director of Emergency Management, stated that "… an additional four feet past that [the wheelchair lift] is required in front of the actual deployment of the lift."[101] Mr. Toomey explained that the additional four feet is "for clearance, to allow someone with a wheelchair to be able to depart the lift and navigate back onto the road…" also referred to as a "pad."[102]

However, the explicit language of the Code of Federal Regulations, which is repeatedly cited by RTA, calls for "a clear length of 96 inches minimum measured perpendicular to the curb or vehicle edge," as displayed above.[103] As such, it appears that any stop along the St. Charles

---

[101] Tr. at 75.

[102] *Id.*

[103] 49 C.F.R. Part 37, Appendix A. (See figure above). *See also* Department of Justice, ADA 2010 Standards: 810.2.2 Transportation Facilities, Dimensions.

streetcar line with at least 96 inches (or 8 feet) of clearance perpendicular from the curb should be accessible to Plaintiff. Plaintiff contends that he can be safely pushed on and off the lift with about 10 feet of clearance.[104] Plaintiff states that all 87 of the challenged stops have at least 10 feet of clear space to deploy the right-side lift.[105] At the evidentiary hearing, Plaintiff's father, Christopher Edmunds, confirmed that he personally measured the length of clearance at the challenged stops.[106] At the evidentiary hearing, counsel for RTA also stipulated that the measurements along Carrollton Ave. exceed 10 feet.[107] Thus, all of the challenged stops exceed the requisite clearance set out by the Code of Federal Regulations and should be accessible to Plaintiff if the wheelchair lift fully deploys.

The parties dispute whether the wheelchair lift is fully deployed when the "lip" of the wheelchair lift is still raised. At the evidentiary hearing, RTA presented evidence that the lip of the wheelchair lift would not deploy at St. Charles Ave. and State St. outbound because the surface was not level.[108] During the site visit, the Court observed Plaintiff disembark from the streetcar stop at S. Carrolton & Birch.  The sidewalk is about four feet in width, and the lip of the wheelchair lift did not deploy automatically. However, Plaintiff's father was able to maneuver the wheelchair to push the lip down manually and dismount. It does not look like this method of forcibly pushing the lip down could cause damage to the wheelchair lift. It took very little force to push the lip

---

[104] *Id.*

[105] Rec. Doc. 9-1 at 11.

[106] Tr. at 43–46.

[107] *Id.* at 81.

[108] Tr. at 63–64; Tr. at 73–74.

down. Moreover, Plaintiff's father could very easily maneuver around the lip. The Court notes that some tree stumps near the sidewalk could possibly be a trip hazard. However, once again, Plaintiff's father easily maneuvered around the tree stumps as Plaintiff's wheelchair is small and flexible. RTA also alleges that the wheelchair lift did not fully deploy at the St. Charles Ave. and Lafayette St. outbound.[109] The Court assumes the conditions are the same as the stops it observed.

In sum, Plaintiff has demonstrated a substantial likelihood of success on the merits of his claim since RTA is not in compliance with parts 37 and 38 of the Code of Federal Regulations by refusing to allow Plaintiff to disembark at designated stops. "Public entities shall ensure that the construction of bus boarding and alighting areas comply with 810.2.2, to the extent the construction specifications are within their control."[110] Thus, the Court finds that Plaintiff has met his burden of proving a substantial likelihood of success on the merits of his "discrimination" claim as it relates to 49 C.F.R. § 37.167(g).

### 3.    Whether the Discrimination is by Reason of Plaintiff's Disability

The third element of a claim under Title II of the ADA is that the plaintiff must show that he was discriminated against by reason of his disability. To show that discrimination is by reason of disability, a plaintiff must provide "proof that 'the disability and its consequential limitations were known by the entity providing public services.'"[111] In *Windham v. Harris Cty., Texas*, the Fifth Circuit explained this requirement as such:

> Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced as a result of that disability. Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would

---

[109] Rec. Doc. 19-2 at 3.

[110] Department of Justice, ADA 2010 Compliance Standards: 810.2.2 Transportation Facilities; Dimensions.

[111] *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015)) (internal brackets omitted).

be reasonable under the circumstances. Thus, because the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms. When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents.[112]

Here, the Complaint refers to two occasions upon which Plaintiff attempted to board a streetcar on the St. Charles Ave. streetcar line. On the second occasion, an RTA supervisor came to the scene. The RTA supervisor stated that Plaintiff could board at the stop, but he could not disembark at his desired location.[113] The Complaint also refers to communications with RTA's general counsel wherein Plaintiff's father requested that RTA allow his family to board "ADA cars" at "any and all stops" along the St. Charles Ave. line.[114] RTA's general counsel responded stating, "[t]he RTA is not going to make any and all stops ADA compliant because there is not enough space to accommodate the lift."[115] By reaching out to general counsel and requesting the accommodation, Plaintiff put RTA on notice that he is being denied access to the streetcar. Therefore, Plaintiff has proven a substantial likelihood of success on the merits as to this element.

**B.**    ***Irreparable Harm***

Next, Plaintiff must prove a substantial threat of irreparable harm if the injunction is denied. Plaintiff argues that if he is substantially likely to prevail on the merits, then irreparable harm is presumed.[116] Plaintiff also argues that Title II of the ADA "expressly authorize[s]" the injunctive

---

[112] *Id.* at 236–37 (internal quotations, ellipsis, and citations omitted) (emphasis in original).

[113] Rec. Doc. 9-1 at 5.

[114] *Id.* at 6.

[115] *Id.*

[116] Rec. Doc. 9-1 at 17.

relief that Plaintiff seeks.[117] As such, it is Plaintiff's position that he need not establish specific irreparable injury to obtain a preliminary injunction.[118] Plaintiff also argues, "when a civil rights statute is violated, irreparable injury should be presumed from the very fact that the statute has been violated."[119] However, the Fifth Circuit has only applied this reasoning to cases involving employment discrimination.

Plaintiff contends that he will never be able to relive his childhood, and no amount of money can undo the harm.[120] "An injury is 'irreparable' only if it cannot be undone through monetary remedies."[121] Other courts have held that irreparable harm would be suffered when a plaintiff was being denied equal participation in city services, programs, and activities.[122] As such, the Court finds that irreparable harm has been established.

## C.    *Threatened Injury Outweighs the Harm*

Next, Plaintiff must prove that his threatened injury outweighs the harm to Defendant. Plaintiff argues that his threatened injury far outweighs the harm to RTA because RTA can "merely" deploy its wheelchair lifts at the challenged stops and implement a "minor update" to the LePass app.[123] RTA does not address this element in its opposition. All things considered, it appears the only harm RTA may face in the granting of the requested injunctive relief is concern

---

[117] *Id.* at 18.

[118] *Id.*

[119] *E.E.O.C. v. Cosmair, Inc. L'Oreal Hair Care Div.,* 821 F.2d 1085, 1090 (5th Cir. 1987).

[120] Rec. Doc. 9-1 at 18.

[121] *Burgess v. Fed. Deposit Ins. Corp.,* 871 F.3d 297, 304 (5th Cir. 2017).

[122] *Tyler v. City of Manhattan*, 857 F. Supp. 800, 820 (D. Kan. 1994)

[123] Rec. Doc. 9-1 at 18.

for future liability should an accident occur. The Court does not find that this potential harm outweighs the threatened injury to Plaintiff. As such, the Court finds that Plaintiff has met his burden as to this element.

### D.    Public Interest

Next, Plaintiff must show that the public interest would not be disserved by the granting of the injunction. The public interest factor requires the Court to consider what public interests may be served by granting or denying a preliminary injunction.[124] Plaintiff argues that the injunctive relief Plaintiff seeks in this motion is in the public's interest.[125] "It is always in the public interest to prevent the violation of a party's constitutional rights."[126] It cannot be denied that there is a strong public interest in ensuring that individuals with disabilities are not denied access to public transportation. There is also a public interest in ensuring that said individuals have real-time location technology to properly plan and schedule to embark on public transportation. The Court finds that Plaintiff has shown that the public interest would not be disserved.

### E.    Security

Pursuant to Federal Rule of Civil Procedure 65, if the Court issues a preliminary injunction, the movant is required to give security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The amount of security required pursuant to Rule 65(c) is a matter of discretion of the trial court, and a court may elect to require no security at all.[127] Rule 65(c) allows the court to provide the

---

[124] *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

[125] *Id.* at 19.

[126] *Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014).

[127] *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

amount that it "considers proper."[128] Pursuant to Federal Rule of Civil Procedure 65, the parties should submit evidence to assist the Court in determining the proper amount to pay the costs and damages sustained by the defendant if it is later found to have been wrongfully enjoined or restrained.[129]

Plaintiff argues that no security is necessary, and RTA does not respond to this argument. Therefore, the Court concludes that the posting of security is not necessary in this case.

### V. Conclusion

For the reasons stated herein, the Court concludes that Plaintiff has met its burden of proving (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) that his threatened injury outweighs the harm to RTA; and (4) that the public interest would not be disserved by the granting of the injunction. The Court is mindful that this litigation involves one plaintiff with a specialized wheelchair and makes note that the streetcar stops mentioned herein may not be accessible to an adult passenger with a regular-sized wheelchair.

Considering evidence presented and the Court's observations at the site visit, the Court grants the motion as it relates to the foregoing identified stops. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction is **GRANTED IN PART** and **MOOT IN PART**. Plaintiff's Motion for Preliminary Injunction seeks two forms of preliminary injunctive relief:

(1) RTA must comply with 49 C.F.R. § 37.167(g) by allowing Plaintiff to board and disembark at any streetcar stop where the wheelchair lift can be safely deployed, regardless of whether RTA believes a particular stop is fully compliant with the technical scoping requirements

---

[128] *A.T.N. Indus., Inc. v. Gross*, No. 14-20102, 2015 WL 8105841 (5th Cir. 2015) (per curiam).

[129] Fed. R. Civ. P. 65(c).

of the ADA; and

(2) RTA must comply with 49 C.F.R. § 37.167(f) by adding location data to its "app" (called "Le Pass"), so that Plaintiff (and other wheelchair users) can see the location of the two wheelchair-accessible streetcars on the St. Charles line in real time, rather than guessing and waiting for one to finally arrive.[130]

Pursuant to stipulation of the parties,[131] and considering RTA's recent updates to the LePass App, the Motion for Preliminary Injunction is **MOOT** as to the latter request.

As to the former request, the Motion for Preliminary Injunction is **GRANTED** and Plaintiff will be allowed to board and disembark at the following St. Charles streetcar line stops:

1. St. Charles Ave. and Tulane University (inbound) *Pursuant to the parties' stipulation*;
2. St. Charles Ave. and Tulane University (outbound) *Pursuant to the parties' stipulation*;
3. Tivoli Circle (inbound);
4. Tivoli Circule (outbound);
5. St. Charles Ave. and Erato St. (inbound);
6. St. Charles Ave. and Erato St. (outbound);
7. St. Charles Ave. and MLK Blvd./Melpomene St. (inbound);
8. St. Charles Ave. and MLK Blvd./Melpomene St. (outbound);
9. St. Charles Ave. and Euterpe St. (inbound);
10. St. Charles Ave. and Euterpe St. (outbound);
11. St. Charles Ave. and Felicity St. (inbound);
12. St. Charles Ave. and Felicity St. (outbound);
13. St. Charles Ave. and St. Andrew St. (inbound);
14. St. Charles Ave. and St. Andrew St. (outbound);
15. St. Charles Ave. and Constantinople St. (inbound);
16. St. Charles Ave. and Constantinople St. (outbound);
17. St. Charles Ave. and Milan St. (inbound);
18. St. Charles Ave. and Milan St. (outbound);
19. St. Charles Ave. and Jena St. (inbound);
20. St. Charles Ave. and Jena St. (outbound);
21. St. Charles Ave. and Cadiz St. (inbound);
22. St. Charles Ave. and Cadiz St. (outbound);

---

[130] Rec. Doc. 9.

[131] *See* Tr. at 13.

23. St. Charles Ave. and Bordeaux St. (inbound);
24. St. Charles Ave. and Bordeaux St. (outbound);
25. St. Charles Ave. and Robert St. (inbound);
26. St. Charles Ave. and Robert St. (outbound);
27. St. Charles Ave. and Duffosat St. (inbound);
28. St. Charles Ave. and Valmont St. (inbound);
29. St. Charles Ave. and Valmont St. (outbound);
30. St. Charles Ave. and Jefferson Ave. (inbound);
31. St. Charles Ave. and Jefferson Ave. (outbound);
32. St. Charles Ave. and Joseph St. (inbound);
33. St. Charles Ave. and Joseph St. (outbound);
34. St. Charles Ave. and Nashville Ave. (inbound);
35. St. Charles Ave. and Nashville Ave. (outbound);
36. St. Charles Ave. and State St. (inbound);
37. St. Charles Ave. and Webster St. (inbound);
38. St. Charles Ave. and Webster St. (outbound);
39. St. Charles Ave. and Calhoun St. (inbound);
40. St. Charles Ave. and Calhoun St. (outbound);
41. St. Charles Ave. and Exposition Blvd. (inbound);
42. St. Charles Ave. and Exposition Blvd. (outbound);
43. St. Charles Ave. and Tulane/Loyola (inbound);
44. St. Charles Ave. and Tulane/Loyola (outbound);
45. St. Charles Ave. and Walnut St. (inbound);
46. St. Charles Ave. and Walnut St. (outbound);
47. St. Charles Ave. and Broadway St. (inbound);
48. St. Charles Ave. and Broadway St. (outbound);
49. Carrollton Ave. and Maple St. (inbound);
50. Carrollton Ave. and Maple St. (outbound);
51. Carrollton Ave. and Freret St. (inbound);
52. Carrollton Ave. and Freret St. (outbound);
53. Carrollton Ave. and Oak St. (inbound);
54. Carrollton Ave. and Oak St. (outbound);
55. Carrollton Ave. and Willow St. (inbound);
56. Carrollton Ave. and Willow St. (outbound);
57. Carrollton Ave. and Jeannette St. (inbound);
58. Carrollton Ave. and Hickory St. (inbound);
59. Carrollton Ave. and Hickory St. (outbound);
60. Carrollton Ave. and Spruce St. (inbound);
61. Carrollton Ave. and Spruce St. (outbound);
62. Carrollton Ave. and Sycamore St. (inbound);
63. Carrollton Ave. and Sycamore St. (outbound)
64. St. Charles & Lafayette (outbound)
65. S Carrolton & Birch (outbound)
66. St. Charles & State (outbound)

**IT IS FURTHER ORDERED** that nothing in this order should be construed as modifying principles of Louisiana tort law, including the "assumption of the risk" doctrine.

**NEW ORLEANS, LOUISIANA**, this  16th  day of May, 2024.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**